Slip Op. 22-50

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ZHEJIANG JUNYUE STANDARD PART CO., LTD., | : | |
| Plaintiff, | : | |
| and | : | |
| NINGBO ZHONGJIANG HIGH STRENGTH BOLTS CO., LTD., | : | |
| Plaintiff-Intervenor, | : | Before: Richard K. Eaton, Judge |
| v. | : | Court No. 20-00102 |
| UNITED STATES, | : | **PUBLIC VERSION** |
| Defendant, | : | |
| and | : | |
| VULCAN THREADED PRODUCTS, INC., | : | |
| Defendant-Intervenor. | : | |

## OPINION AND ORDER

[Final Determination is remanded.]

Dated: May 19, 2022

*Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff Zhejiang Junyue Standard Part Co., Ltd. With her on the brief were *Gregory S. Menegaz* and *J. Kevin Horgan*.

*Kavita Mohan*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for Plaintiff-Intervenor Ningbo Zhongjiang High Strength Bolts Co., Ltd. With her on the brief were *Andrew T. Schutz* and *Jordan C. Kahn*.

*Ashley Akers*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on

the brief were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Jesus N. Saenz*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*William A. Fennell*, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor Vulcan Threaded Products, Inc. With him on the brief were *Roger B. Schagrin* and *Christopher T. Cloutier*.

Eaton, Judge: This case involves the U.S. Department of Commerce's ("Commerce" or the "Department") final affirmative countervailing duty determination in its investigation of carbon and alloy steel threaded rod from the People's Republic of China ("China"). *See Carbon and Alloy Steel Threaded Rod From the People's Republic of China*, 85 Fed. Reg. 8,833 (Dep't Commerce Feb. 18, 2020) ("Final Determination") and accompanying Issues and Decision Mem. (Feb. 7, 2020) ("Final IDM"), PR 343; *see also Carbon and Alloy Steel Threaded Rod From the People's Republic of China*, 84 Fed. Reg. 36,578 (Dep't Commerce July 29, 2019) ("Preliminary Determination") and accompanying Prelim. Decision Mem. (July 22, 2019) ("PDM"), PR 220.

Before the court are the motions for judgment on the agency record of Plaintiff Zhejiang Junyue Standard Part Co., Ltd. ("Junyue") and Plaintiff-Intervenor Ningbo Zhongjiang High Strength Bolts Co., Ltd. ("Zhongjiang Bolts").[1] *See* Junyue's Mem. Supp. Mot. J. Agency R., ECF No. 27-2 ("Pl.'s Br."); Junyue's Reply Br., ECF No. 33. Junye and Zhongjiang Bolts (collectively, "Plaintiffs") are producers of subject merchandise that were individually investigated as mandatory respondents.

By their motions, Plaintiffs primarily challenge Commerce's use of adverse facts available to find that they each received a benefit under the Export Buyer's Credit Program—a government

---

[1]        Zhongjiang Bolts incorporated by reference Junyue's arguments in its opening and reply briefs. *See* Zhongjiang Bolts' Mem. Supp. Mot. J. Admin. R., ECF No. 26; Zhongjiang Bolts' Reply Br., ECF No. 32.

loan program in China. In particular, Plaintiffs question (1) whether substantial evidence supports Commerce's finding that the use of "facts otherwise available," under § 1677e(a), was required because "necessary" information about the operation of the Export Buyer's Credit Program was missing from the record; and if the use of facts available was justified, (2) whether substantial evidence supports Commerce's finding that Plaintiffs received a benefit under the program, where that finding was in direct conflict with declarations placed on the record by Plaintiffs, and (3) whether substantial evidence supports Commerce's application of an adverse inference, under § 1677e(b), when selecting from among the facts available because of China's failure to provide requested information about the program. *See* Pl.'s Br. at 6-16. Junyue also challenges Commerce's finding that its cross-owned affiliates—Affiliates A and B[2]—also benefitted from the Export Buyer's Credit Program, and its decision to *triple* the subsidy rate selected for the program, when calculating Junyue's countervailing duty rate, to account for the benefit received by (1) Junyue, (2) Affiliate A, and (3) Affiliate B. Accordingly, Plaintiffs ask the court to "declare that the Export Buyer's Credit Program must be excluded from [the Respondents' respective countervailing duty] rate calculation[s]." *See* Pl.'s Br. at 22.

The United States ("Defendant") and Defendant-Intervenor and petitioner Vulcan Threaded Products, Inc. argue that Commerce's use of adverse facts available is supported by substantial evidence and is otherwise in accordance with law, and urge the court to sustain the Final Determination. *See* Def.'s Resp. Pls.' Mots. J. Agency R., ECF No. 31 ("Def.'s Br."); *see also* Def.-Int.'s Opp'n Pls.' Mots. J. Agency R., ECF No. 30 ("Def.-Int.'s Br.").

The court finds that substantial evidence does not support Commerce's use of adverse facts available to find that Plaintiffs benefitted from the Export Buyer's Credit Program. Additionally,

---

[2]    The identities of Affiliates A and B are proprietary information.

the court finds that Commerce's decision to triple the subsidy rate selected for the program when calculating Junyue's rate to account for a benefit that the Department claims was received by Junyue's Affiliates A and B has not been explained adequately.

Thus, Commerce's inclusion of an adverse facts available rate for the program when calculating countervailing duty rates for Junyue and Zhongjiang Bolts cannot be sustained. The court thus remands Commerce's calculation of Junyue's and Zhongjiang Bolts' individual countervailing duty rates to either (1) find a practical solution to verify the non-use information on the record, such as the reopening of the record to issue supplemental questionnaires to respondents and their U.S. customers (see *infra* note 10); or (2) recalculate the countervailing duty rates for Junyue and Zhongjiang Bolts to exclude the subsidy rate for the Export Buyer's Credit Program. On remand, should Commerce continue to attempt to justify its benefit determination as supported by substantial evidence and otherwise in accordance with law, it shall explain the tripling effect with specific citation to applicable statutes and substantial record evidence.

## BACKGROUND

The Export Buyer's Credit Program is a state-subsidized loan program, administered by China's state-owned Export Import Bank. *See Clearon Corp. v. United States*, 44 CIT __, __, 474 F. Supp. 3d 1339, 1341 n.5 (2020). Under the program, the Chinese government provides credit at preferential rates to foreign purchasers of goods exported by Chinese companies. *See id.* at __, 474 F. Supp. 3d at 1341 n.5; *see also* Final IDM at 37.

As with other cases involving the Export Buyer's Credit Program that have come before this Court, the record in this case shows that Commerce sent initial and supplemental questionnaires to China, asking for information that, for Commerce, would allow it to fully

understand the operation of the program. Commerce asked for copies of revisions that the Export

Import Bank made in 2013 to its internal guidelines for administering the program, and the

identities of third-party banks involved in the disbursement of buyer's credits.[3] *See* Final IDM

at 32; *see also Clearon*, 44 CIT at __, 474 F. Supp. 3d at 1350-51 & nn.10-12 (collecting cases).

 As in prior cases, here China provided some, but not all, of the information that Commerce

requested. Specifically, China failed to provide "the 2013 Revisions [to the Export Buyer's Credit

Program], a list of all third-party banks involved in the disbursement/settlement of export buyer's

credits, and a list of all partner/correspondent banks involved in disbursement of funds under" the

program. Final IDM at 32. Instead of providing the requested information, China responded that

Commerce's requests for information were "not applicable" and "unnecessary." In place of the

information requested, China provided, among other things, screenshots of the results of searches

of the China Export Import Bank's databases that purported to show that there was no record of

any Export Buyer's Credit Program loans being disbursed to Junyue's or Zhongjiang Bolts' U.S.

customers during the period of investigation. *See* Final IDM at 31-34.

 For their part, Junyue and Zhongjiang Bolts stated in their questionnaire responses that

neither company had benefitted from the program during the period of investigation. In addition,

they placed on the record declarations from their U.S. customers stating that they had not used

export buyer's credits during the period of investigation.[4] *See* Final IDM at 33-34.

---

 [3]    Through questionnaires, Commerce asked for "translated copies of the laws and regulations pertaining to the [Export Buyer's Credit Program], a description of the agencies and types of records maintained for administration of the program, a description of the program and the program application process, program eligibility criteria, and program use data." Final IDM at 32.

 [4]    *See, e.g.*, Junyue's Initial Sec. III Resp. (May 29, 2019) at 11-13, Ex. 10, PR 185-188, CR 72-77 (stating a U.S. customer "did not finance those purchases from Zhejiang Junyue Standard Part Co., Ltd or any other purchases, during the [period of investigation] or previously,

Commerce conducted verification in China, but it did not attempt to verify evidence of usage of the Export Buyer's Credit Program provided by the Chinese government. According to Commerce, it "no longer attempts to verify usage of the [Export Buyer's Credit] program with [China] given the inadequate information provided in its questionnaire responses, in particular, [China's] refusal to provide the 2013 revisions to the administrative rules." *See* Final IDM at 33 n.236; *see also* 19 U.S.C. § 1677m(i)(1) (2018) (Commerce "shall verify all information relied upon in making . . . a final determination in an investigation.").

Nor did Commerce verify, or attempt to verify, Junyue's and Zhongjiang Bolts' claims their U.S. customers did not use the Export Buyer's Credit Program. *See, e.g.*, Junyue Verification Rep. (Dec. 2, 2019), PR 330; Zhongjiang Bolts Verification Rep. (Dec. 2, 2019), PR 329.

The Department's decision not to attempt verification of Plaintiffs' claims of non-use of the Export Buyer's Credit Program at Junyue's and Zhongjiang Bolts' offices in China, or those of their U.S. customers, rested on Commerce's finding that the operational information that China failed to provide—*i.e.*, the 2013 revisions to the program and the identities of third-party banks—was "necessary." Final IDM at 34. For Commerce, its "typical non-use verification procedure" could not be employed to verify the claims of non-use without this "necessary" operational information.[5]

---

through the use of the Export-Import Bank of China's export buyer's credit program, either directly from the Export-Import Bank of China or indirectly from third-party institutions other than the China Export-Import Bank," and "did not have any loans during 2018 that were taken or outstanding related to the purchase of merchandise subject to the scope of the countervailing duty investigation on Carbon and Alloy Steel Threaded Rod from China (C-570-105)."); *see also* Zhongjiang Bolts' Initial Quest. Resp. (May 29, 2019) at 11, Exs. III.A.3a & III.A.3b, PR 179-180, CR 54-60.

[5]    In the Final IDM, Commerce identified the steps to verify "whether and to what extent a respondent exporter had received loans from a state-owned bank":

Commerce deemed the program's operational information "necessary" based on the difficulty that the information's absence might have posed if Commerce had attempted to use its typical non-use verification procedure. The information's necessity apparently had little to do with its relevance to the Department's statutory "benefit" analysis:

> Without such necessary information, Commerce would have to engage in an unreasonably onerous examination of the business activities and records of respondents' customers without any guidance as to which loans or banks to subject to scrutiny for each company. [China] refused to provide a list of all correspondent banks involved in the disbursement of credits and funds under the program. A careful verification of respondents' non-use of this program without understanding the identity of these correspondent banks would be unreasonably onerous, if not impossible. Because Commerce does not know the identities of these banks, Commerce's second step of its typical non-use verification procedures (*i.e.*, examining the company's subledgers for references to the party making the financial contribution) could not by itself demonstrate that the U.S. customers did not use the program (no correspondent banks in the subledger). Nor could the second step be used to narrow down the company's lending to a subset of loans likely to be the export buyer's credits (*i.e.*, loans from the correspondent banks).[6]

> ──────────────

> If Commerce were attempting to confirm whether and to what extent a respondent exporter had received loans from a state-owned bank, . . . its first step would be to examine the company's balance sheets to derive the exact amount of lending outstanding during the period of examination. Second, once that figure was confirmed, Commerce would examine subledgers or bank statements containing the details of all individual loans. Because Commerce could tie or trace the subledgers or bank statements to the total amount of outstanding lending derived from the balance sheets, it could be assured that the subledgers were complete and that it therefore had the entire universe of loan information available for further scrutiny. After examining the subledgers for references to the state-owned banks (for example, "Account 201-02: Short-term lending, Industrial and Commercial Bank of China"), Commerce's third step would be to select specific entries from the subledger and request to see underlying documentation, such as applications and loan agreements, in order to confirm the accuracy of the subledger details. Thus, confirmation that a complete picture of relevant information is in front of the verification team, by tying relevant books and records to audited financial statements or tax returns, is critical.

Final IDM at 28-29, 34-35 (describing steps two and three of the typical non-use verification procedure).

> 6       Commerce also found that the "third step of Commerce's typical non-use verification procedure (*i.e.*, selecting *specific* entries from the subledger and requesting to see

> Thus, verifying non-use of the program without knowledge of the correspondent banks would require Commerce to view the underlying documentation for *all* entries from the subledger *to attempt* to confirm the origin of each loan - *i.e.*, whether the loan was provided from the China Ex-Im Bank *via* an intermediary bank. This would be an unreasonably onerous undertaking for any company that received more than a small number of loans.

Final IDM at 34. In other words, Commerce concluded that without the missing operational information the application of Commerce's typical non-use verification procedure might have been "unreasonably onerous," depending on what it might have found at verification, had it attempted to employ its typical procedure. That is, if it turned out that the respondent's U.S. customers had more than a "small number of loans" during the period of investigation, the second step of its typical procedure would have been burdensome to apply.

Thus, Commerce found that without the "necessary" operational information the Department could not "accurately and effectively" verify Plaintiffs' claims of non-use. *See* Final IDM at 35 ("Commerce finds it could not *accurately and effectively* verify usage at respondents' customers, even were it to have attempted the unreasonably onerous examination of each of their customers' loans.").

Although Commerce stated that it could not verify the information provided by respondents (*i.e.*, the declarations of non-use), Commerce determined that the missing operational information created a gap in the factual record. *See* Final IDM at 37-38 (describing as a "critical gap in the record . . . in this investigation" the missing information concerning the operation of the Export Buyer's Credit Program). Commerce thus determined that the use of facts available was required, under 19 U.S.C. § 1677e(a):

---

underlying documentation, such as applications and loan agreements) likewise would be of no value." Final IDM at 35. According to Commerce, "[t]his step might serve merely to confirm whether banks were correctly identified in the subledger - not necessarily whether those banks were correspondent banks participating in the [Export Buyer's Credit] Program." Final IDM at 35.

> As explained in the *Preliminary Determination*, necessary information from [China] is missing from the record, and [China] withheld the requested information described above, which is necessary to determine whether respondents' U.S. customers actually used the [Export Buyer's Credit] Program during the [period of investigation]. [China's] withholding of this necessary information prevents us from fully understanding and analyzing the operation of this program, thereby impeding this proceeding. Accordingly, we find that we must rely on the facts otherwise available, pursuant to sections 776(a)(1), (a)(2)(A), and (a)(2)(C) of the Act, to determine whether this program was used by Junyue and Zhongjiang Bolts and conferred a benefit.

Final IDM at 36 (footnote omitted).[7]

It is worth noting that, although Commerce, in the quoted language above, stated that it "must rely on the facts otherwise available . . . to determine whether this program was used by Junyue and Zhongjiang Bolts and conferred a benefit," the Department ultimately failed to identify which record facts it relied upon to fill the gaps with respect to each respondent's *use* of and *benefit* from the program. That is, Commerce did not identify how it filled the gap created by the missing *operational* information. Indeed, Commerce declined to rely on the only facts that were available on the record that pertained to use and benefit, *i.e.*, the respondents' questionnaire responses, and their respective U.S. customers' declarations of non-use.

Additionally, Commerce further found that the use of an adverse inference, when selecting from among the facts available, was warranted under § 1677e(b), because China failed to cooperate to the best of its ability with Commerce's requests for information. *See* Final IDM at 36 ("[China's] refusal to provide the 2013 Revisions, which set internal guidelines for how this program is

---

[7]    Though much of Commerce's discussion in the Final IDM centers on how difficult it would be to verify non-use of the program without the operational information it requested from China, the Department did not cite the provision of the statute that is triggered when record information "cannot be verified" (§ 1677e(a)(2)(D)) as a grounds for its use of "facts otherwise available," presumably because the conclusion that something cannot be done is generally preceded by a failed attempt to do it. Here, Commerce did not attempt to verify the evidence of non-use provided either by China or Plaintiffs.

administered by the China Ex-Im Bank, and a list of partner/correspondent banks that are used to disburse funds through this program, constitutes a failure to cooperate to the best of [China's] ability.").

Based on its facts available and adverse inferences findings, Commerce stated: "Therefore, as [adverse facts available], we find that respondents Junyue and Zhongjiang Bolts used and benefited from [the Export Buyer's Credit Program] program, despite their claims that their U.S. customers had not obtained export buyer's credits from the China Ex-Im Bank during the [period of investigation]." *See* Final IDM at 36-37.

Apart from the adverse facts available finding that Commerce made based on China's failure to provide requested information, Commerce made a separate, limited adverse facts available finding in the Final Determination based on Junyue's failure to report certain information that was necessary to Commerce's analysis of cross-ownership of affiliates—*i.e.*, whether Affiliates A and B provided inputs to the subject merchandise during the period of investigation. Commerce found that this information was available to Junyue, but that it had failed to do its best to provide it to Commerce, justifying the application of an adverse inference. *See* Final IDM at 46 (finding "that Junyue was inattentive in not fully responding to our inquiry regarding whether Affiliates A and B were input providers in our questionnaires, despite the fact that we gave them ample opportunity to provide this information."). As adverse facts available with respect to the missing information, Commerce found that Affiliates A and B were cross-owned. Plaintiffs do not dispute Commerce's finding on cross-ownership. *See* Pls.' Br. at 18 ("As [adverse facts available], Commerce found that Junyue and Affiliates A and B are cross-owned. Junyue does not challenge . . . Commerce's determination to find Affiliates A and B are cross-owned affiliates of Junyue here.").

Commerce calculated each respondent's final countervailing duty rate by adding together the subsidy rates for the programs by which each company was found to have benefitted. The Department selected a 10.54 percent[8] subsidy rate for the Export Buyer's Credit Program pursuant to 19 U.S.C. § 1677e(d), finding that it was the highest rate determined for a similar program in a separate proceeding that involved the same country. *See* PDM at 15.

With respect to Junyue, Commerce tripled that 10.54 percent rate based on its finding that Junyue and Affiliates A and B were cross-owned entities:

> Commerce finds that Affiliates A and B also benefitted from all of the same programs Junyue benefitted from and that the subsidies they received that are attributable to Junyue are in the same subsidy rates as we calculate for Junyue. Although Junyue reported that the affiliates do not produce subject merchandise, there is no record evidence that indicates that Affiliates A and B could not have benefitted from the same programs that Junyue benefitted from.

Final IDM at 47. Plaintiffs dispute Commerce's "tripling" of the rate as arbitrary and capricious because, as Commerce acknowledged, the record shows that neither Affiliate A nor Affiliate B produced subject merchandise, but rather performed services for Junyue. *See* Pl.'s Br. 19 ("[T]here were no imports of subject merchandise into the United States from either of the two allegedly cross-owned affiliates."); and 3 ("Commerce's verifier found that Affiliates A and B performed certain services for Junyue during the Period of Investigation."). Therefore, Plaintiffs maintain, Commerce's decision to triple Junyue's rate lacks the support of substantial evidence.

Ultimately, Junyue received a total countervailing duty rate of 66.81 percent. Zhongjiang Bolts received a 31.02 percent rate. *See* Final Determination, 85 Fed. Reg. at 8,834.

---

[8]        The selection of the 10.54 percent rate is not in dispute.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii). The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

Under the countervailing duty statute, if Commerce determines that a foreign government or public entity "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," a duty will be imposed in an amount equal to the net countervailable subsidy. 19 U.S.C. § 1671(a); *see also Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000) ("The Tariff Act provides that before Commerce imposes a countervailing duty on merchandise imported into the United States, it must determine that a government is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise." (citation omitted)). This "remedial measure . . . provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (citation omitted). The statute applies equally when the imported merchandise is from a nonmarket economy country. *See* 19 U.S.C. § 1671(f)(1); *see also TMK IPSCO v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1306, 1313 (2017) ("Commerce generally must impose countervailing duties

on merchandise from a non-market economy . . . country if Commerce makes the findings necessary to countervail a subsidy more generally under the statute." (citation omitted)).

A subsidy is countervailable when (1) a foreign government provides a financial contribution (2) to a specific industry and (3) a recipient within the industry receives a benefit as a result of that contribution. *See* 19 U.S.C. § 1677(5)(B). The statute expands upon each of these three factors. First, "financial contribution" means, in pertinent part, "the direct transfer of funds, such as . . . loans." *Id.* § 1677(5)(D)(i). Second, to be actionable a subsidy must be specific, as defined. *Id.* § 1677(5A)(A)-(B) ("A subsidy is specific if it is an export subsidy," *i.e.*, "a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."). Third, in the case of government loans, a "benefit" is conferred "if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market." *Id.* § 1677(5)(E)(ii); 19 C.F.R. § 351.505(a) (2019) (same).

To analyze these three factors, "Commerce often requires information from the foreign government allegedly providing the subsidy." *Fine Furniture*, 748 F.3d at 1369-70 (citing *Essar Steel Ltd. v. United States*, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1296-97 (2010), *rev'd on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012)). This is because "normally, [foreign] governments 'are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients.'" *Id*. at 1370 (quoting *Essar Steel*, 34 CIT at 1070, 721 F. Supp. 2d at 1297). "Additionally, Commerce sometimes requires information from a foreign government to determine whether a particular respondent received a benefit from an alleged subsidy." *Id*.

Where the Department lacks the information it needs to make a countervailing duty determination, it must use "facts otherwise available." 19 U.S.C. § 1677e(a). If Commerce determines that the use of facts otherwise available is warranted, and makes the additional finding that a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it may use an adverse inference "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (discussing the two-step analysis that applies to the use of facts available and adverse inferences under 19 U.S.C. § 1677e). It bears repeating that if and only if the use of facts otherwise available is required under § 1677e(a) may Commerce go on to determine whether the use of an adverse inference when selecting from among the facts available is justified based on the non-cooperating party's failure to do its best, under § 1677e(b).

The additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information," can only be made after Commerce performs two tasks. *See* 19 U.S.C. § 1677e(b)(1).

> First, it must make an objective showing that a reasonable and responsible [respondent] would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

*Nippon Steel*, 337 F.3d at 1382-83 (citation omitted). "It is worth noting that the subjective component of the 'best of its ability' standard judges what constitutes the maximum effort that a particular respondent is capable of doing, not some hypothetical, well-resourced respondent." *Nat'l Nail Corp. v. United States*, 43 CIT __, __, 390 F. Supp. 3d 1356, 1373 (2019). Thus, "[a]n

adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel*, 337 F.3d at 1383. The purpose of applying an adverse inference is to encourage future compliance by respondents. *See Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1239-40 (2021) (discussing use of adverse facts available as an "inducement" for compliance).

A foreign government may be found to be a non-cooperating party. *See Fine Furniture*, 748 F.3d at 1371 ("[O]n its face, the statute authorizes Commerce to apply adverse inferences when an interested party, including a foreign government, fails to provide requested information."). Under such circumstances, the application of adverse facts available "may adversely impact a cooperating party, although Commerce should seek to avoid such impact *if relevant information exists elsewhere on the record*." *Archer Daniels Midland Co. v. United States*, 37 CIT 760, 769, 917 F. Supp. 2d 1331, 1342 (2013) (citation omitted) (emphasis added); *see also Fine Furniture*, 748 F.3d at 1372 (emphasis added) (upholding the application of adverse facts available where Commerce did "not apply adverse inferences *to substitute for any information that was actually submitted by the cooperating respondents*.").

**DISCUSSION**

Plaintiffs claim that substantial evidence does not support Commerce's use of facts available, pursuant to 19 U.S.C. § 1677e(a), based on a claimed "gap" in the factual record left by China's failure to provide information about the operation of the Export Buyer's Credit Program. As noted, Commerce found the information was "necessary" in order to employ its typical non-

use verification procedure. For Plaintiffs, the record is complete on the issue of non-use: "[R]ecord evidence only establishes that Junyue or its customers did not use or benefit from the [Export Buyer's Credit] program." Pl.'s Br. at 9. Plaintiffs maintain that non-use declarations from their U.S. customers, and corroborating statements by the Chinese government, including the state-owed Export Import Bank, show that neither Plaintiffs nor their U.S. customers used or benefitted from the program. *See* Pl.'s Br. at 2-3. Thus, Plaintiffs argue, Commerce's use of facts available to reach a contrary conclusion, without even attempting to verify the non-use evidence, cannot be sustained. In support of their arguments, Plaintiffs cite cases where this Court, presented with similar facts, has found that Commerce's use of facts available lacked the support of substantial evidence. *See* Pl.'s Br. at 10.

In addition, Plaintiffs maintain that the record evidence of non-use can be verified using Commerce's existing methods. *See* Pl.'s Br. at 16-18. As to Commerce's claim that the missing operational information is necessary because without it verification of non-use would be unreasonably onerous, Plaintiffs maintain that Commerce's existing methods for verifying non-use would have sufficed even if Junyue's U.S. customers had a large number of lending transactions during the period of investigation:

> [T]he sampling method is applied in every investigation (as well as at verification), and there is no reason why Commerce cannot do the same if Junyue's customers have a large number of outstanding financings during the [period of investigation]. Commerce could have adopted such procedures during the year-long investigation to confirm that the U.S. customers did not take [Export Buyer's Credit] loans. It is simply untenable for Commerce to insist on the non-use being unverifiable while making no attempts to verify at all during the lengthy investigation.

Pl.'s Br. at 17. Indeed, Plaintiffs point out that Commerce employed the sampling method at Junyue's verification of home market and export sales: "Commerce 'selected individual transactions' instead of examining the underlying documents for each sale to determine whether

Junyue's reporting of domestic sales versus U.S. sales was accurate." Pl.'s Br. at 17 (citing Junyue Verification Rep. at 4).

Thus, for Plaintiffs, because there was information on the record regarding non-use, which pertained to the "benefit" element of the countervailing duty statute, and because the non-use information could be verified using the Department's sampling method, Commerce's finding that there was a "gap" in the record that required the use of facts otherwise available cannot be sustained. Plaintiffs ask the court to "declare that the Export Buyer's Credit Program must be excluded from [the Respondents' countervailing duty] rate calculation[s]." Pl.'s Br. at 22. Moreover, Plaintiffs maintain, if Commerce is directed to remove the 10.54 percent rate from the calculation of Junyue's individual countervailing duty rate, it should also remove the rate as applied to Junyue's Affiliates A and B. *See* Pl.'s Br. at 18.

For its part, Commerce continues to disagree with the position taken by Plaintiffs here, and with the rulings of this Court in similar prior cases: "Commerce disagrees with the outcome of these prior cases examining the Export Buyer's Credit program." Def.'s Br. at 14 (citing, *e.g.*, *Clearon*, 44 CIT at __, 474 F. Supp. 3d at 1339). Instead, Commerce insists on the position it took during the investigation proceeding:

> Commerce continues to find that the Chinese government's withholding of the requested information concerning the Export Buyer's Credit program created a gap of information. The gap of information created by the Chinese government's withholding of the requested information rendered Commerce unable to fully analyze the Export Buyer's Credit program. Plaintiffs do not point to any evidence on the record that fills the gap of information needed by Commerce to understand and analyze the Export Buyer's Credit program. Thus, plaintiffs' argument ignores the missing record evidence that Commerce required in order to analyze the Export Buyer's Credit program.

Def.'s Br. at 14 (citing Final IDM at 31-38). In other words, for Commerce, the non-use

information on the record does not fill the gaps regarding how the program operates.[9] Moreover,

Commerce maintains that without this information, it could not "accurately and effectively" verify

the non-use evidence using its typical non-use verification procedure. *See* Final IDM at 35

("Commerce finds it could not *accurately and effectively* verify usage at respondents' customers,

even were it to have attempted the unreasonably onerous examination of each of their customers'

loans.").

  This Court has issued several opinions reviewing the legal and factual sufficiency of

Commerce's use of adverse facts available in cases where China has failed to provide requested

information about the operation of the Export Buyer's Credit Program. On similar factual records,

the Court has rejected Commerce's position that information about the operation of the Export

Buyer's Credit Program is necessary for it to verify a respondent's claimed non-use of the program.

*See, e.g.*, *Clearon*, 44 CIT at __, 474 F. Supp. 3d at 1350 & nn.10-12 (collecting cases). *Guizhou*

*Tyre Company v. United States* is particularly informative. There the Court reviewed an

explanation by Commerce, as to why it could not verify the respondent's claims of non-use of the

Export Buyer's Credit Program. As summarized by the Court:

> Commerce continues to find that there is a gap in the record because the Department
> cannot verify the submitted non-use declarations without additional information
> surrounding the 2013 revisions to the [Export Buyer's Credit Program]. One of the
> revisions involved routing [Export Buyer's Credit Program] loans through
> (undisclosed) third-party banks, and not through the Export-Import Bank of China
> . . . as Commerce originally thought. As in the previous administrative review, the
> Department reiterated that "[China] once again refused to provide the sample
> application documents or any regulations or manuals governing the approval

---

[9]  For its part, Defendant-Intervenor echoes Commerce's position: "In sum, absent
the information that could only be provided by [China], Commerce was unable to verify the
information provided by [China's] and respondents' customers to demonstrate no [Export Buyer's
Credit] subsidization in a timely manner and so was forced to rely on facts available." Def.-Int.'s
Br. at 18.

> process [for the Program]." Without this information, Commerce concluded that it
> could "not verify non-use of export buyer's credits" "in a manner consistent with
> its verification methods, which are primarily the methods of an auditor, attempting
> to confirm usage or claimed non-usage by examining books and records which can
> be reconciled to audited financial statements, or other documents." Commerce
> asserts that the "completeness" principle is "an essential element of Commerce's
> verification methodology," and without the allegedly "missing" information, the
> Department's verification "would amount to looking for a needle in a haystack with
> the added uncertainty that Commerce might not even be able to identify the needle
> when it was found." Therefore, Commerce continues to impute usage of the [Export
> Buyer's Credit Program] based on the application of adverse facts available.

43 CIT __, __, 415 F. Supp. 3d 1335, 1341 (2019) (internal record citations omitted). The Court

rejected Commerce's explanation, noting that "[t]he Department's (flawed) reasoning has

remained unwavering" despite many opinions issued by the Court "urging Commerce to correct

the repeated blatant deficiencies in its adverse facts available analyses of the [Export Buyer's

Credit Program]." *Id.* at __, 415 F. Supp. 3d at 1341. Specifically, the *Guizhou Tyre* Court found

that Commerce had failed to make a finding that a "gap" in the record existed with respect to the

required statutory elements of a countervailing duty determination:

> Here, the Department's investigation relates to whether the [Export Buyer's Credit
> Program] provides a countervailable subsidy to Plaintiffs. Under the
> [countervailable duty] statute, this requires a finding that a specific financial
> contribution occurred, and a benefit was therefore conferred. *See* 19 U.S.C.
> § 1677(5). The gap then, must relate to either element of this inquiry. Just because
> Commerce resorted to adverse facts available "does not obviate the need for
> Commerce to affirmatively find that the elements of the statute have been satisfied."
> [*Changzhou Trina Solar Energy Co. v. United States*, 43 CIT __, __, 359 F. Supp.
> 3d 1329, 1338 (2019)]. But as it currently stands, the Department has assumed the
> conclusion—that a gap in the record exists as a result of [China]'s failure to
> cooperate—without addressing what "constitutes a 'gap' in the record," [*Zhejiang
> DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1347 (Fed. Cir. 2011)],
> and by pointedly closing its eyes on the evidence provided by Guizhou that would
> "fairly detract[ ]" from its ultimate conclusion, *CS Wind Vietnam Co. v. United
> States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The law does not permit Commerce
> to circumvent the statutory requirements of the [countervailable duty] statute just
> because a respondent fails to cooperate; nor is Commerce "relieve[d] [ ] from
> relying on *some* facts to make the requisite determinations to satisfy the elements
> of 19 U.S.C. § 1677(5)." *Changzhou Trina Solar Energy Co.*, 43 CIT [at] __, 359
> F. Supp. 3d at 1340 (emphasis added). Stripped away of its misconceptions

surrounding the [adverse facts available] statute, the Department is left with the most compelling facts placed on the record: that Plaintiffs *did not use* the Program, and therefore, no specific benefit was conferred.

*Id.* at __, 415 F. Supp. 3d at 1342. The *Guizhou Tyre* Court found compelling that

[t]here is evidence in the record that squarely detracts from Commerce's inference that Plaintiffs used and benefited from the [Export Buyer's Credit Program]. Commerce may not simply declare that the evidence cannot be verified and therefore, a gap exists. That is not how it works. Commerce must attempt verification *in order to conclude* that a gap exists related to that inquiry.

*Id.* at __, 415 F. Supp. 3d at 1343. Accordingly, the *Guizhou Tyre* Court remanded with instructions that Commerce "attempt verification of the submitted non-use declarations from Plaintiffs' U.S. customers, using all reasonable tools at its disposal, including methods suggested by Plaintiffs and by this court;" and "detail its process in its remand redetermination as it relates to its verification of the non-use declarations." *Id.* at __, 415 F. Supp. 3d at 1344.[10]

---

[10]    After remands in the *Guizhou Tyre* case and other cases Commerce ultimately determined (under protest) that the Chinese respondents in each case had not used or benefitted from the Export Buyer's Credit Program. Though Commerce "protests" the Court's rulings on this issue, to the court's knowledge, it has never appealed. *See Clearon*, 44 CIT at __, 474 F. Supp. 3d at 1353 n.13 ("It is worth noting that, despite Commerce's respectful protest, the United States elected not to file an appeal in any of the aforementioned cases."). Nonetheless, there are signs that Commerce is reconsidering its procedure for verifying claims of non-use of the program. *See, e.g.*, *Certain Mobile Access Equip. and Subassemblies Thereof From the People's Republic of China*, 86 Fed. Reg. 57,809 (Dep't Commerce Oct. 19, 2021) and accompanying Issues and Decision Mem. (Oct. 12, 2021) at 49-50 ("[C]onsidering court precedent, Commerce developed supplemental questionnaires issued to mandatory respondents and their U.S. customers requesting additional information regarding its financing activities to probe claims of non-use for the Export Buyer's Credit program."); *see also Risen Energy Co. v. United States*, 46 CIT __, Slip Op. 22-44 at 5 (May 12, 2022) (granting voluntary remand so that "the Government may attempt to verify the customer certifications of non-use," and directing that "[i]f the Government decides to remove the [Export Buyer's Credit Program] from its subsidy calculation under protest but does not intend to appeal, it must explain on remand why the Court should not provide some form of equitable relief, such as the immediate return of deposits, or an injunction of the continued inclusion of the program with no attempt at verification that results in the temporary collection of funds that ultimately are not owed.").

Here, Commerce's statutory duty was to determine whether and to what extent the Export Buyer's Credit Program provided a benefit to Junyue and Zhongjiang Bolts. *See* 19 U.S.C. § 1677(5) (defining countervailable subsidy). Under the statute, that determination required a finding as to whether "a specific financial contribution occurred, and a benefit was therefore conferred." *Guizhou Tyre*, 43 CIT at __, 415 F. Supp. 3d at 1342 (citing 19 U.S.C. § 1677(5)).

Evidence pertinent to this inquiry was on the record. Specifically, non-use declarations by Plaintiffs' U.S. customers show that neither of the Plaintiffs nor their U.S. customers used or benefitted from the program during the period of investigation. Additionally, screenshots of the results of searches of the Export Import Bank's databases purporting to show that China had no record of any Export Buyer's Credit Program loans being disbursed to Junyue or Zhongjiang Bolts, their affiliates, or their U.S. customers during the period of investigation are also on the record. *See* Final IDM at 31-34. The only statements on the record that Commerce refers to that might contradict these statements are in the petition. *See* Final IDM at 37 (noting that "the program was alleged by the petitioner as an example of a possible export subsidy"). To the extent Commerce relied on petition statements in the Final Determination, however, there is no evidence on the record that Commerce attempted to verify them, or the statements of non-use, or any of the information that China provided in response to Commerce's questionnaires. Nor for that matter have petitioners placed any evidence on the record to support their claims that Junyue, Zhejiang Bolts, or any of their U.S. customers actually took advantage of the program. *See* Resp. Quest. on Countervailing Duty Pet'n (Mar. 1, 2019) at 2, PR 43 (footnote omitted) ("As indicated in the Petition, many producers of [carbon and alloy steel threaded rod] export significant volumes of their production. It is therefore reasonable to assume that such companies avail themselves of the export credits available from the Chinese government. It is also reasonable to assume that their

customers avail themselves of preferential buyer's credits."). The statute mandates that Commerce "shall verify all information relied upon in making . . . a final determination in an investigation." *See* 19 U.S.C. § 1677m(i)(1). It seems that here Commerce gave up on that duty by insisting that without the operational information that China failed to provide its "typical non-use verification procedure" would be too burdensome to employ, if, it turned out, that more than a "small number of loans" existed on the books of the Plaintiffs' U.S. customers. *See* Final IDM at 34. As this Court recently stated in response to Commerce's "unreasonably onerous" argument, "Commerce's position assumes that it cannot narrow the scope of its inquiry. But to know whether it can narrow the scope, or establish an alternative method of verification, Commerce needs to ask the [respondent] and its U.S. customers for assistance." *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 46 CIT __, __, 557 F. Supp. 3d 1327, 1336 (2022) (citation omitted). The record does not show, and Commerce does not claim, that when deciding whether to verify the claims of non-use the Department undertook to determine the number of loans on Plaintiffs' U.S. customers' books during the period of investigation.

Under these circumstances, the court cannot say that substantial evidence supports Commerce's determination that a gap in the factual record existed as to whether Plaintiffs' U.S. customers used the Export Buyer's Credit Program to purchase subject merchandise exported by Plaintiffs.

The court further notes that, although the Federal Circuit has upheld the use of adverse facts available against a cooperative party where a foreign government has failed to provide requested information, it has not sanctioned Commerce's application of "adverse inferences *to substitute for any information that was actually submitted by the cooperating respondents*." *Fine Furniture*, 748 F.3d at 1372 (emphasis added); *see also Archer Daniels Midland*, 37 CIT at 769,

917 F. Supp. 2d at 1342 (citation omitted) (emphasis added) ("Commerce should seek to avoid such impact *if relevant information exists elsewhere on the record*.").

In past opinions, the Court has directed Commerce to confer with the parties to come up with a practical solution to attempt verification of the non-use evidence on the record, or exclude the Export Buyer's Credit Program rate from the calculation of the respondent's countervailing duty rate. To the court's knowledge, in each such case, Commerce chose "under protest" to exclude the Export Buyer's Credit Program rate from its countervailing duty rate calculation. Though, in this case, Defendant has expressed its disagreement with the Court's prior rulings, more recently, Commerce has demonstrated some willingness to reconsider its procedure for verifying claims of non-use of the program. *See* Def.'s Br. at 14 ("Commerce disagrees with the outcome of these prior cases examining the Export Buyer's Credit program."); *see also Certain Mobile Access Equip. and Subassemblies Thereof From the People's Republic of China*, 86 Fed. Reg. 57,809 (Dep't Commerce Oct. 19, 2021) and accompanying Issues and Decision Mem. (Oct. 12, 2021) at 49-50 ("[C]onsidering court precedent, Commerce developed supplemental questionnaires issued to mandatory respondents and their U.S. customers requesting additional information regarding its financing activities to probe claims of non-use for the Export Buyer's Credit program."). Thus, the court directs Commerce to either (1) find a practical solution to verify the non-use information on the record, such as the reopening of the record to issue supplemental questionnaires to respondents and their U.S. customers (see *supra* note 10); or (2) recalculate the countervailing duty rates for Junyue and Zhongjiang Bolts to exclude the subsidy rate for the Export Buyer's Credit Program.

As for Junyue's Affiliates A and B, Commerce's finding that "there is no record evidence that indicates that Affiliates A and B *could not have benefitted*[11] from" the Export Buyer's Credit Program does not establish that they did with substantial evidence. As to the tripling of the claimed benefit received by Junyue based on Affiliates A and B's provision of services, this determination is so completely unexplained that it is difficult for the court to assess whether it is supported by substantial evidence or in accordance with law. On remand, should Commerce continue to attempt to justify its benefit determination as supported by substantial evidence and otherwise in accordance with law, it shall explain the tripling effect with specific citation to applicable statutes and substantial record evidence.

### CONCLUSION AND ORDER

Based on the forgoing, it is hereby

**ORDERED** that this matter is remanded to Commerce; it is further

**ORDERED** that Commerce shall submit a redetermination upon remand that complies in all respects with this Opinion and Order; it is further

**ORDERED** that Commerce shall reconsider its calculation of Junyue's and Zhongjiang Bolts' individual countervailing duty rates and either (1) find a practical solution to verify the non-use information on the record, such as the reopening of the record to issue supplemental questionnaires to respondents and their U.S. customers; or (2) recalculate the countervailing duty

---

[11]    Neither this Court's decision in *Uttam Galva Steels Limited v. United States*, nor its affirmance by the Federal Circuit bear on the outcome of this case. As this Court's opinion notes, the facts in that case are sufficiently different from those of the case before the court to provide any guidance. *See* 45 CIT __, __, 518 F. Supp. 3d 1333, 1340-41 (2021), *aff'd*, 2022 WL 1419596 (Fed. Cir. 2022).

rates for Junyue and Zhongjiang Bolts to exclude the subsidy rate for the Export Buyer's Credit Program; it is further

**ORDERED** that Commerce shall explain, with specific citation to applicable statutes and substantial record evidence, its decision to triple the rate selected for the Export Buyer's Credit Program when calculating Junyue's countervailing duty rate; and it is further

**ORDERED** that Commerce's remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

    /s/ Richard K. Eaton    
Judge

Dated: May 19, 2022
      New York, New York